IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH DEON HORNE, | No. C 08-01387 SBA (PR) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| J. C. RUTLEDGE, et al., | (Docket no. 10) |
| Defendants. | |

## INTRODUCTION

Plaintiff Joseph Deon Horne, a state prisoner currently incarcerated at Kern Valley State Prison, in Delano, California, filed the instant pro se civil rights action under 42 U.S.C. § 1983. He alleges that Pelican Bay State Prison (PBSP) Correctional Officers J. C. Rutledge and C. R. Thompson used excessive force against him on June 8, 2007, when they sprayed him with oleoresin capsicum ("pepper spray").[1] Plaintiff claims that the use of force was a violation of the Eighth Amendment.

Defendants now move for summary judgment on the grounds that there are no material facts in dispute and that they are entitled to judgment as a matter of law. Defendants also claim that they are entitled to qualified immunity.

For the reasons outlined below, the Court GRANTS Defendants' motion for summary judgment.

## PROCEDURAL BACKGROUND

On March 11, 2008, Plaintiff filed a complaint alleging: (1) excessive use of force by PBSP officials, specifically Defendants Rutledge and Thompson; and (2) supervisory liability against PBSP Sergeant R. Navarro and PBSP Warden R. Horel. (Compl. at 3-5.)

On October 20, 2008, the Court found cognizable Plaintiff's excessive force claim against Defendants Rutledge and Thompson. (Oct. 20, 2008 Order at 3.) Plaintiff's supervisory liability

---

[1] Subsequent to the incident in question, Plaintiff was transferred from PBSP to Kern Valley State Prison.

claim was dismissed with leave to amend because he had failed to allege facts sufficient to state a cognizable claim for relief. (Id.) The Court directed Plaintiff to amend his supervisory liability claim by November 20, 2008, and informed him that the failure to do so would result in the dismissal of the claim. (Id.)

Plaintiff failed to file an amended supervisory liability claim; therefore, on December 8, 2008, the Court dismissed without prejudice the supervisory liability claim against Defendants Navarro and Horel. (Dec. 8, 2008 Order at 1.) Thus, Plaintiff's only remaining claim is his Eighth Amendment excessive force claim.

On February 11, 2009, Defendants Rutledge and Thompson filed a motion for summary judgment on the grounds that they used pepper spray in a "good faith attempt to protect their own safety and to maintain security at the prison" because the pepper spray was "administered only after Plaintiff refused to comply with Defendants' demand that he refrain from covering the front of his cell with a blanket." (Mot. for Summ. J. at 5, 6.) In the alternative, Defendants maintain that they are entitled to qualified immunity because Plaintiff has failed to show that his constitutional rights were violated during the altercation and because it would not have been clear to a reasonable prison official that their actions were unlawful. (Id. at 8.)

On March 23, 2009, Plaintiff filed his opposition.

On April 1, 2009, Defendants filed a reply to Plaintiff's opposition.

## DISCUSSION

### I. Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial burden of identifying those

portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. Id. If the nonmoving party fails to make this showing, "the moving party is entitled to summary judgment as a matter of law." Celotex, 477 U.S. at 323.

The district court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence and the inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. See id. at 631. If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). A court may not disregard direct evidence on the ground that no reasonable jury would believe it. See id. (where nonmoving party's direct evidence raises genuine issues of fact but is called into question by other unsworn testimony, district court may not grant summary judgment to moving party on ground that direct evidence is unbelievable). The district court may not resolve disputed issues of material fact by crediting one party's version of events and ignoring another. Wall v. County of

1  Orange, 364 F.3d 1107, 1111 (9th Cir. 2004) ("By deciding to rely on the defendants' statement of
2  fact [in deciding a summary judgment motion], the district court became a jury.").  But "[w]hen
3  opposing parties tell two different stories, one of which is blatantly contradicted by the record, so
4  that no reasonable jury could believe it, a court should not adopt that version of the facts for
5  purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 127 S. Ct.
6  1769, 1776-77 (2007).

**II.     Evidence Considered**

A district court may only consider admissible evidence in ruling on a motion for summary judgment.  See Fed. R. Civ. P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002). Unauthenticated documents and hearsay evidence are inadmissible, and consequently, may not be considered on summary judgment.  Orr, 285 F.3d at 773-74, 778.

In support of their motion for summary judgment, Defendants have submitted a declaration by their attorney, Michael Quinn (docket no. 11), and a declaration by Defendant Rutledge (docket no. 12).

Attached to Mr. Quinn's declaration are three documents concerning the event in question: (1) the Inmate/Parolee Appeal Form; (2) the Warden's Level Decision; and (3) the Director's Level Appeal Decision.  (Quinn Decl., Exs. B, C, D.)  Also attached to Mr. Quinn's declaration is the declaration of the California Correctional Institution Custodian of Records, certifying that the attached three documents are true and correct copies of the original documents.  (Quinn Decl., Ex. A.)  Because these three documents have been properly authenticated pursuant to Federal Rule of Evidence 803(6), the Court will consider these documents in connection with Defendants' motion for summary judgment.

Attached to Defendant Rutledge's declaration is a copy of a portion of the PBSP Use of Force Policy ("Force Policy") relating to the immediate use of force.  (Rutledge Decl., Ex. E.) Defendant Rutledge states that the submitted exhibits are accurate copies of what they purport to be. (Rutledge Decl. ¶ 2.)  Defendant Rutledge's declaration is sufficient to authenticate the Force Policy because, as a PBSP correctional officer, he is familiar with the contents of that document.

Therefore, the Court will also consider the Force Policy in connection with the instant summary judgment motion.

Plaintiff has verified his complaint and opposition by signing both under penalty of perjury. Therefore, aside from considering his opposition, the Court may treat the allegations in the verified complaint as an opposing affidavit to the extent such allegations are based on Plaintiff's personal knowledge and set forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating a plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, he stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).

Attached to Plaintiff's opposition are (1) the Crime/Incident Reports of Defendants Rutledge and Thompson, as well as Officer R. Throop; (2) the Rules Violation Report; (3) the Director's Level Appeal Decision; (4) the Warden's Level Decision; and (5) the Inmate/Parolee Appeal Form. (Opp'n, Exs. A, B.)  Also attached to Plaintiff's opposition is the declaration of the California Correctional Institution Custodian of Records, certifying that the five documents attached are true and correct copies of the originals.  (Opp'n, Ex. B.)  Because these five documents have been properly authenticated pursuant to Federal Rule of Evidence 803(6), the Court will consider these documents in connection with Defendants' motion for summary judgment.

Also attached to Plaintiff's opposition is the same section of the Force Policy that is attached to Defendant Rutledge's declaration.  (Opp'n, Ex. C.)  Because this document is evidence already considered in connection with the summary judgment motion, there is no need to consider the same portion that is attached in Plaintiff's complaint.

Finally, Plaintiff has also attached his Medical Report of Injury or Unusual Occurrence. (Opp'n, Ex. A.)  Plaintiff does not attach any documentation that certifies that this medical report is a true and correct copy of the original.  Therefore, this document is not admissible evidence because it has not been properly authenticated pursuant to Federal Rule of Evidence 803(6).  Furthermore,

1   even if the document were admissible, neither party refers to it.[2]

## III. Factual Background

### A. Defendants' Version

On June 8, 2007, the control booth officer in PBSP Facility A-1 observed "water running out of Plaintiff's cell" and notified Defendants Rutledge and Thompson that Plaintiff was attempting to flood the tier. (Rutledge Decl. ¶ 4). Defendants note that "[s]uch flooding disrupts both the prison's operations and programming for inmates, since officers are called away from their normal tasks to stop the flow of water." (Id.) Defendant Rutledge shut off the water to Plaintiff's cell and placed dams in front of his cell door to contain the flooding. (Id.)

Defendants claim that Plaintiff "was in an agitated state when [Defendant Rutledge] arrived outside of [Plaintiff's] cell . . . ." (Id. ¶ 5.) In the Incident Report, Defendant Rutledge recalled that Plaintiff stated, "If you guys want a cell extraction we'll cell extract." (Opp'n, Ex. A, Rutledge Incident Report.)[3] At the time, Plaintiff was holding a state-issued sheet. (Id.) Defendant Rutledge ordered Plaintiff not to cover his cell door with the sheet or he would be pepper sprayed. (Id.) Plaintiff, while still holding the sheet, continued to state that he "was going to cell extract." (Id.) When Defendant Rutledge again ordered Plaintiff to not cover his cell door, warning that he would resort to pepper spray, Plaintiff went to his bed and retrieved his state-issued blanket. (Id.) Plaintiff then began to cover the front of his cell with his blanket. (Rutledge Decl. ¶ 5.) Defendants argue that at this point Plaintiff "presented a direct, immediate and serious threat to the safety and security of both the staff who were present at the scene as well as the institution as a whole." (Id.) They note that after covering up the front of his cell, an inmate "will typically 'booby trap' the inside of his cell," a process which involves tearing up sheets or clothing and tying them to pieces of furniture in order to create a "spider web" effect. (Id.) The Force Policy permits the immediate use of force

---

[2] The Court notes that the medical report noted that Plaintiff had no injuries. (Opp'n, Ex. A.)

[3] Although Defendants did not attach the Incident Reports in their moving papers or their reply, Plaintiff has attached certified copies of the Incident Reports to his opposition. Because the Incident Report cited above was written by Defendant Rutledge, the Court will consider it as a supplement to Defendants' version of events.

6

1 when an inmate tries to create the "spider web" effect.  (Rutledge Decl., Ex. A at 10.)

2 Defendant Rutledge discharged one three-second burst of pepper spray into Plaintiff's cell and then ordered him to take the cover down.  (Opp'n, Ex. A, Rutledge Incident Report.)  Plaintiff did not comply; therefore, Defendant Rutledge discharged an additional three-second burst of pepper spray.  (Id.)  Defendant Rutledge again ordered Plaintiff to stop covering his cell; however, Plaintiff again refused to comply.  (Id.)  Defendant Thompson then discharged another three-second burst of pepper spray, striking Plaintiff with the spray in the head area.  (Opp'n, Ex. A, Thompson Incident Report.)  Plaintiff "continued trying to hold the blanket against the cell front," and Defendant Thompson discharged an additional three-second burst of pepper spray, again striking Plaintiff with the spray in the head area.  (Opp'n, Ex. A, Rutledge Incident Report; Opp'n, Ex. A, Thompson Incident Report.)  At this point, Plaintiff put his blanket into the cuff port, and Defendant Rutledge pulled it out.  (Id.)  Plaintiff then submitted to mechanical restraints.  (Id.)

### B. **Plaintiff's Version**

Plaintiff confirms he attempted to flood the tier on June 8, 2007.  (Opp'n, Ex. B., Inmate/Parolee Appeal Form.)  He alleges that he was having a "mental disability episode" and that he was hearing voices.  (Id.)  Plaintiff confirms that Defendants shut off his water and placed dams in front of his cell door.  (Opp'n at 4.)  Plaintiff alleges that Defendants "came in to the section storming up to [Plaintiff's] cell looking like as if their only intentions were to use physical force."  (Opp'n, Ex. B., Inmate/Parolee Appeal Form.)  A verbal altercation took place between Defendants and Plaintiff, during which Defendant Rutledge asked Plaintiff why he was flooding his cell and Plaintiff responded, "I can't take it . . . I am going crazy."  (Id.)  Plaintiff claims, "[T]he manner [in which Defendants] approached my cell front . . . left me no choice but to defend myself, in the best way I can, there for [sic] I grabbed my sheet and informed c/o Rutledge that 'I'd put it up (the sheet) in any attempt of him spraying me.'"  (Id., parentheses in original.)  Plaintiff confirms that Defendant Rutledge ordered him not to put up the sheet.  (Id.)  Plaintiff contends that Defendant Rutledge then began shaking his cannister of pepper spray and, interpreting such an action to be "an indication of an assault about to happen . . . [Plaintiff] grabbed [his] blanket after dropping [his] sheet . . . Then held [his] blanket up to the door [with his] hands and yelled, 'Don't fucking fog me you bitch.'"  (Id.,

7

1  second ellipses in original.)[4]  Plaintiff confirms that Defendant Rutledge and Defendant Thompson
2  each sprayed him two times.  (Opp'n at 4.)  Plaintiff continued to hold the blanket up until during the
3  third or fourth discharge of pepper spray.  (Opp'n, Ex. B., Inmate/Parolee Appeal Form.)  Upon
4  reviewing Plaintiff's 602 inmate appeal form, it is unclear as to when exactly during Defendant
5  Thompson's discharges did the blanket fall: "[Defendant Thompson] sprayed thru [sic] the
6  blanket . . . As I turned around the blanket fell and my back was to the door [and Defendant
7  Thompson] continue [sic] to fog me on the back of my head and back.  I yelled, 'I'm trying to cuff
8  up.'"  (Id., ellipses in original.)  Plaintiff adds that Defendants Rutledge and Thompson were able to
9  see into his cell during the altercation and emphasizes that there was a five foot long window
10 directly to the left of his cell door.  (Opp'n at 6, 7.)  Finally, Plaintiff notes that Defendants have not
11 presented any evidence that suggests he was attempting to "spider web" his cell.  (Id. at 7.)

**IV.    Excessive Force Claim**

   **A.    Applicable Law**

A prisoner has the right to be free from cruel and unusual punishment, including physical abuse by guards.  Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (citing Whitley v. Albers, 475 U.S. 312, 317 (1986)).  In making this determination, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  See Hudson, 503 U.S. at 7; see also Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).  If the force officers

---

[4] Unlike his 602 inmate appeal form, Plaintiff's opposition gives a more abbreviated account of the incident.  Completely omitting any mention of the sheet, the opposition alleges that Defendants threatened "to fog" Plaintiff with pepper spray and it was only then that Plaintiff grabbed the blanket and "stood in front of the door and held [the blanket] up to himself to lessen the assault."  (Opp'n at 4.)  Because Plaintiff includes more detail in his 602 appeal than in his opposition, the Court has cited to his 602 appeal.

8

1  use is so disproportionate to that required that it suggests deliberate sadism, the use of force violates
2  the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 322 (1986); Madrid v. Gomez, 889 F.
3  Supp. 1146, 1172 (N.D. Cal. 1995) (finding that although cell extractions are "an essential tool in
4  maintaining security in any prison," pattern of unnecessary extractions and massive force employed
5  violated Eighth Amendment).
6        Still, not every criticism of an officer's conduct suggests excessive force. Whitley, 475 U.S.
7  at 322.  The Eighth Amendment does not prohibit uses of force that appear unreasonable in
8  hindsight, so long as the officers were acting in good faith and for a legitimate end. Id.; compare
9  Clement v. Gomez, 298 F.3d 898, 903-04 (9th Cir. 2002) (applying Eighth Amendment "malicious
10 and sadistic" standard to prison pepper spray incident) with Headwaters Forest Defense v. County of
11 Humboldt, 240 F.3d 1185, 1198-1206 (9th Cir. 2000), vacated on other grounds, 533 U.S. 194
12 (2001) (applying Fourth Amendment "objectively reasonable" excessive force standard to police use
13 of pepper spray).  In order for an Eighth Amendment excessive force case to go to the jury, the
14 evidence must go "beyond a mere dispute over the reasonableness of a particular use of force or the
15 existence of arguably superior alternatives" to support "a reliable inference of wantonness in the
16 infliction of pain." Whitley, 475 U.S. at 322.

### B. Analysis

18       Plaintiff contends that Defendants Rutledge's and Thompson's use of pepper spray was
19 malicious and sadistic, and therefore in violation of the Eighth Amendment. (Opp'n at 2.)  However,
20 Plaintiff's arguments are unavailing because he fails to back up his allegations with "specific,
21 nonconclusory, factual allegations" that would, if proven, show bad motive. See Jeffers v. Gomez,
22 267 F.3d 895, 907 (9th Cir. 2001).  Plaintiff concedes he disobeyed orders not to cover his cell front.
23 (Opp'n, Ex. B, Inmate/Parolee Appeal Form.)  Defendant Rutledge therefore properly perceived
24 Plaintiff's action as a refusal to comply, thus justifying the use of force to maintain or restore
25 discipline.  See Hudson, 503 U.S. at 6-7; see also Glass v. Scribner, 2009 WL 2579657, at *5 (E.D.
26 Cal.) (finding that even if inmate placed a mattress in front of his body to protect himself, his refusal
27 to comply with staff orders justified the use of force because "[i]nsubordination is a matter taken
28

very seriously within the confines of an institutional setting."). Moreover, although Plaintiff argues that his use of the sheet and blanket were merely defensive, he acknowledges that Defendant Rutledge did not use pepper spray until <u>after</u> Plaintiff covered his cell front with his blanket. (Opp'n, Ex. B, Inmate/Parolee Appeal Form; Opp'n at 4.) In fact, Plaintiff concedes that he was holding the blanket up to the door during three, if not all four, discharges of pepper spray. (Opp'n, Ex. B, Inmate/Parolee Appeal Form.) Viewed in the light most favorable to Plaintiff, the facts indicate that Defendants acted in a good-faith effort to maintain or restore discipline. Even if Defendant Thompson discharged the fourth spray after the blanket had fallen, such facts do not necessarily infer bad motive on the part of Defendants. Plaintiff concedes that he was holding the blanket the first time Defendant Thompson sprayed him ("he sprayed thru [sic] the blanket"), and it is apparent that the time period between Defendant Thompson's first discharge, the blanket falling, and the final discharge was quite brief ("As I turned around the blanket fell and my back was to the door [and Defendant Thompson] continue [sic] to fog me on the back of my head and back. I yelled, 'I'm trying to cuff up.'"). (<u>Id.</u>) Plaintiff also does not argue that Defendant Thompson continued to discharge the pepper spray after Plaintiff had indicated submission. (<u>Id.</u>) Accordingly, Plaintiff's allegations are insufficient to raise a genuine issue of material fact regarding Defendants Rutledge's and Thompson's intent to harm. <u>See</u> <u>Spain</u>, 600 F.2d at 195.

Plaintiff also contends that Defendants' use of force "is not supported by any C.D.C. policy."[5] (Opp'n at 2.) The Force Policy permits the immediate use of force in the following situation:

> Inmates tearing up sheets or clothing and in the act of tying them to the bed, desk, or sink, in an effort to create a 'spider web' effect, or tearing up the mattress and in the act of attempting to wear it as 'armor.' This creates an unsafe situation in the event staff must enter the cell.

(Rutledge Decl., Ex. A at 10.) Plaintiff correctly notes that such a policy does not explicitly permit the use of force when an inmate is attempting to cover his cell front with a blanket. Defendants have not presented any evidence to suggest that he was attempting to "spider web" his cell. (Opp'n at 7.) In response to Defendants' assertion that "[i]mmediate force is proper . . . when inmates attempt to

---

[5] The only "C.D.C. policy" that Plaintiff addresses is the PBSP Use of Force Policy, which he attaches to his opposition. Accordingly, the Court only considers this policy in its analysis.

10

seriously damage the structure of a cell or obscure the view into their cell," (Rutledge Decl. ¶ 4), Plaintiff alleges that both Defendants were able to see into his cell during the altercation, noting the window directly to the left of his cell door. (Opp'n at 6, 7.) Despite Defendants' failure to identify language in the Force Policy which explicitly sanctions their discharge of pepper spray during the incident in question, Plaintiff's arguments are unavailing. The Force Policy prefaces its list of situations that permit the immediate use of force with the following qualification: "This procedure identifies some of the more common occurrences and gives guidance on handling these incidents. The examples identified below are not to be construed as the only instances where immediate force can be used." (Rutledge Decl., Ex. A at 9.) Only a few sentences later, it repeats, "Listed below are examples, but not a comprehensive list, of situations where the use of immediate force may be proper . . . ." (Id.) Thus, the absence of a situation resembling the incident in question does not preclude the propriety of Defendants' use of force.

In sum, Plaintiff fails to raise a genuine issue of fact regarding Defendants Rutledge's and Thompson's malicious intent. Accordingly, Defendants are entitled to summary judgment on the excessive force claim as a matter of law. See Celotex, 477 U.S. at 323.

## V.  **Qualified Immunity Defense to Excessive Force Claim**

Defendants argue, in the alternative, that summary judgment is warranted because, as government officials, they are entitled to qualified immunity from Plaintiff's excessive force claim.

### A.  **Applicable Law**

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such a right was "clearly established." Pearson v. Callahan, __ U.S.

11

1 __, 129 S. Ct. 808, 818 (2009) (overruling the sequence of the two-part test that required
2 determination of a deprivation first and then whether such right was clearly established, as required
3 by Saucier and holding that court may exercise its discretion in deciding which prong to address
4 first, in light of the particular circumstances of each case). The relevant, dispositive inquiry in
5 determining whether a right is clearly established is whether it would be clear to a reasonable officer
6 that his conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 202.

### B. Analysis

The Court finds that, viewing the evidence in the light most favorable to Plaintiff, Defendants' actions did not amount to an Eighth Amendment violation. Even if a constitutional violation had occurred, it would not have been clear to a reasonable officer in Defendants' position that their conduct violated the prohibition against excessive force. It is not disputed that, at the time of Defendants' actions, the malicious and sadistic use of force against prisoners was a violation of the Eighth Amendment. However, a reasonable officer could have believed that the amount of force used was lawful in light of clearly established law and PBSP's Force Policy. See Saucier, 533 U.S. at 205 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)) (reasonableness of officer's belief as to appropriate level of force should be judged from an on-scene perspective).

Officers are entitled to make considered judgments, as well as reasonable mistakes, about the amount of pepper spray necessary to prevent a breach of discipline from becoming more severe. See Clement, 298 F.3d at 904. In Clement, prison officials broke up a fight between two inmates confined to a cell using two bursts of pepper spray. Id. Nearby inmates claimed the officers dispensed a second burst of pepper spray after the targeted inmates began to cough and gag. Id. The officers stated they deployed the second burst because the first burst failed to hit the fighting inmates square on. Id. The Ninth Circuit held that the second burst did not imply the officers acted maliciously. Id.

Here, the reasonableness of Defendants' actions is demonstrated by the fact that they present undisputed evidence to explain why they used pepper spray in the quantity and at the time they did. Defendants claim that they initially sprayed Plaintiff with pepper spray so that he would desist from

blocking his cell door with a blanket. Although a jury could infer that raising the sheet was a defensive maneuver and not a preparation for assault, even in that case Defendants' actions would simply show they were mistaken about Plaintiff's motivations. Because PBSP's Force Policy specifically outlined a situation in which inmates might use bed linens to prepare for assault (and sanctioned the use of force in that instance), a reasonable officer could have believed that his actions were lawful. (Rutledge Decl., Ex. E at 10.) Similarly, the fourth discharge of pepper spray, even if discharged after the blanket had fallen, was at most a reasonable mistake about the amount of pepper spray necessary to prevent the altercation from becoming more severe. See Clement, 298 F.3d at 904. Therefore, Defendants could reasonably have believed that the force they used was necessary after Plaintiff failed to comply with orders.

In sum, Defendants claim to have used reasonable force in a good faith effort to restore and maintain discipline. See Jeffers, 267 F.3d at 912. The Court finds that a reasonable officer in Defendants' position could have believed that their actions were lawful. See Marquez v. Gutierrez, 322 F.3d 689, 691 (9th Cir. 2003). Therefore, even if there was a constitutional violation, under Saucier, Defendants are entitled to qualified immunity with respect to Plaintiff's claim of excessive force and thus are entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (docket no. 10).

The Clerk of the Court shall enter judgment in favor of Defendants, terminate all pending motions, and close the file.

This Order terminates Docket no. 10.

IT IS SO ORDERED.

DATED: September 30, 2009

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
United States District Judge

P:\PRO-SE\SBA\CR.08\Horne1387.grantMSJ.wpd  13

1  UNITED STATES DISTRICT COURT
2  FOR THE
3  NORTHERN DISTRICT OF CALIFORNIA

| JOSEPH HORNE, | Case Number: CV08-01387 SBA |
|---|---|
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | |
| J.C. RUTLEDGE et al, | |
| Defendant. | |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 2, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Joseph Deonn Horne V84328
Kern Valley State Prison
P.O. Box 5102
Delano, CA 93216

Dated: October 2, 2009

Richard W. Wieking, Clerk
By: LISA R CLARK, Deputy Clerk

P:\PRO-SE\SBA\CR.08\Horne1387.grantMSJ.wpd

14